FILED
RICHARD W. NAGEL
CLERK OF COURT

2017 OCT 12 PM 1:49

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
EAST. DIV. COLUMBUS

# IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CASE NO. 2:17-cr-233 |
| | : | JUDGE MARBLEY |
| Plaintiff, | : | |
| | : | |
| v. | : | **INDICTMENT** |
| | : | **18 U.S.C. § 371** |
| PETROS CONTOGURIS, a/k/a, | : | **15 U.S.C. § 78dd-2** |
| PETROS CONTOGURIS-TROEMEL | : | **18 U.S.C. § 1956(h)** |
| | : | **18 U.S.C. § 1956(a)(2)(A) & (B)** |
| Defendant. | : | **18 U.S.C. § 2** |
| | : | **FORFEITURE** |
| | : | |
| | : | **UNDER SEAL** |

**THE GRAND JURY CHARGES:**

## INTRODUCTION

At all times relevant to this Indictment:

### Certain Relevant Persons and Entities

1.    Rolls-Royce Energy Systems, Inc. ("RRESI"), was a United States company headquartered in the Southern District of Ohio, and thus was a "domestic concern" within the meaning of the Foreign Corrupt Practices Act of 1977 ("FCPA"), Title 15, United States Code, Section 78dd-2.   RRESI was an indirect subsidiary of Rolls-Royce plc ("Rolls-Royce"), a publicly traded company in the United Kingdom, which was a holding company with major business operations in the civil, aerospace, defense, marine, and energy sectors worldwide. RRESI produced and supplied compressors and power turbines and provided aftermarket services for oil and gas and power generation projects in a number of countries worldwide, including Kazakhstan.

1

2. Asia Gas Pipeline, LLP ("AGP") was a state-owned joint venture between Kazakhstan's KazMunayGas and China's National Petroleum Corporation that was created to build and connect a gas pipeline between Kazakhstan and China. KazMunayGas was controlled by Kazakhstan and performed government functions on behalf of Kazakhstan. China National Petroleum Corporation was controlled by China and performed government functions on behalf of China. In addition, AGP was controlled by the Kazakh and Chinese governments and performed government functions for Kazakhstan and China. Thus, KazMunayGas, China National Petroleum Corporation, and AGP were each an "instrumentality" within the meaning of the FCPA.

3. "Technical Advisor," a company whose identity is known to the Grand Jury, was an international engineering and consulting firm with offices worldwide. Technical Advisor purported to provide independent engineering advice and project management in a number of business sectors, such as national infrastructure, oil and gas, and energy. Technical Advisor served as an independent engineering consultant to AGP.

4. The defendant, **PETROS CONTOGURIS, a/k/a PETROS CONTOGURIS-TROEMEL ("CONTOGURIS")**, a Greek national and resident of Istanbul, Turkey, was the founder and Chief Executive Officer of Gravitas & CIE International Ltd. ("Gravitas"), a Turkey-based commercial agent and advisor for various oil and gas projects throughout the world. **CONTOGURIS** was a commercial agent for RRESI on the Asia Gas Pipeline project in Kazakhstan. **CONTOGURIS** was an "agent" of a domestic concern within the meaning of the FCPA.

5. Rolls-Royce Employee 1 ("RR-1"), an individual whose identity is known to the Grand Jury, was a Dutch national and an employee of Dutch subsidiaries of Rolls-Royce, with responsibility for selling equipment manufactured or assembled by RRESI.

2

6. Rolls-Royce Employee 2 ("RR-2"), an individual whose identity is known to the Grand Jury, was a U.S. national and employee of Rolls-Royce with responsibility as a sales director for the sales of equipment manufactured and assembled by RRESI.

7. Rolls-Royce Employee 3 ("RR-3"), an individual whose identity is known to the Grand Jury, was an executive of Rolls-Royce with responsibility over the Rolls-Royce energy sales division, including the sale of equipment manufactured and assembled by RRESI and on behalf of Rolls-Royce-affiliated entities in multiple countries worldwide.

8. Technical Advisor Employee 1 ("TA-1"), an individual whose identity is known to the Grand Jury, was a Russian national and employee of the Almaty, Kazakhstan office of Technical Advisor.

9. Technical Advisor Employee 2 ("TA-2"), an individual whose identity is known to the Grand Jury, was an Austrian national and employee of the Munich, Germany office of Technical Advisor.

10. Technical Advisor Employee 3 ("TA-3"), an individual whose identity is known to the Grand Jury, was an Armenian national and employee of the Beijing, China office of Technical Advisor.

11. "Foreign Official 1," an individual whose identity is known to the Grand Jury, was a high-ranking Kazakh official of KazMunayGas, which had authority over AGP, and thus was a "foreign official" within the meaning of the FCPA. Foreign Official 1 had the authority to exert official influence over purchasing decisions at AGP. **CONTOGURIS** and the co-conspirators often referred to Foreign Official 1 as "Fox" or "Fuchs."

12. "Foreign Representative," an individual whose identity is known to the Grand Jury, was a Kazakh businessman and former Kazakh government official who acted as an agent and

3

representative for Foreign Official 1's dealings with **CONTOGURIS**, Rolls-Royce, RRESI, Technical Advisor, and the co-conspirators.

13. "Foreign Official 2," an individual whose identity is known to the Grand Jury, was a high-ranking Chinese official of Petrochina and its subsidiaries that had authority over AGP, and thus was a "foreign official" within the meaning of the FCPA. Foreign Official 2 had the authority to exert official influence over purchasing decisions at AGP.

### General Allegations

14. Rolls-Royce, through its U.S. subsidiary RRESI, retained **CONTOGURIS** to pay bribes to various individuals, including Foreign Official 1, in order to help Rolls-Royce and RRESI secure and maintain contracts with AGP. After securing the contracts, RRESI paid **CONTOGURIS** a percentage of the payments it received from AGP, which **CONTOGURIS** in turn divided with Foreign Official 1 and other co-conspirators.

15. Specifically, in or around 2007, Kazakh and Chinese state-owned oil and gas companies entered into the AGP joint venture agreement to construct a gas pipeline stretching between Central Asia and China. Rolls-Royce, through RRESI, was among several companies bidding for contracts in the construction of the pipeline beginning in or around 2008. Rolls-Royce employees, including RR-1, RR-2, and RR-3, sought a commercial advisor with access to key decision-makers in Kazakhstan in order to secure some of the contracts that AGP was going to put out for tender. In particular, they had identified Foreign Official 1 as one of the key decision-makers and were exploring ways to set up a meeting with Foreign Official 1. In or around the same time, **CONTOGURIS** began working with TA-1, TA-2, and TA-3 to find a company willing to pay them kickbacks in exchange for them helping that company win contracts with AGP, including by paying bribes to Foreign Official 1 and others.

4

16.     Rolls-Royce and RRESI, through RR-1, RR-2, RR-3, and others, began working toward an agreement with **CONTOGURIS**, TA-1, TA-2, and TA-3, and others, in or around late 2008 when AGP was awarding the first project, Compressor Station 4.   RRESI had put in its bid too late to influence the decision, however, and AGP awarded Compressor Station 4 to RRESI's main competitor ("the Competitor") in or around March 2009.   The sides still continued to work on coming to an agreement whereby RRESI would pay **CONTOGURIS** a commission through his company Gravitas, which **CONTOGURIS**, Foreign Official 1, TA-1, TA-2, TA-3, and others, would split.   AGP went on to award RRESI a contract for 11 of the 14 units comprising Compressor Stations 1, 2, 6 and 7 in or around November 2009 for approximately $145 million. AGP then made payments to RRESI starting in early 2010, and RRESI in turn made commission payments to Gravitas.   **CONTOGURIS** passed a portion of those commissions onto TA-1 and TA-3, knowing that TA-1 and TA-3 were going to share that money with Foreign Official 1 consistent with the corrupt agreement.

## COUNT ONE
### (Conspiracy to Violate the FCPA)

17.     Paragraphs 1 through 16 are re-alleged and incorporated by reference as though fully set forth herein.

18.     Beginning at least in or around 2008 and continuing through in or around 2012, within the Southern District of Ohio and elsewhere, the defendant,

### PETROS CONTOGURIS, a/k/a
### PETROS CONTOGURIS-TROEMEL,

did knowingly and willfully, that is, with the intent to further the objects of the conspiracy, combine, conspire, confederate, and agree with others known and unknown, including, among others, RR-1, RR-2, and RR-3, to commit offenses against the United States, namely, to willfully make use of the mails and means and instrumentalities of interstate commerce corruptly in

5

furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value, to a foreign official and to any person, while knowing that all, or a portion of such money and things of value would be and had been offered, given, and promised to a foreign official, for purposes of (i) influencing acts and decisions of such foreign official in his or her official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing any improper advantage; and (iv) inducing such foreign official to use his or her influence with a foreign government and agencies and instrumentalities thereof, to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist RRESI in obtaining and retaining business for and with, and directing business to, Rolls-Royce, RRESI, **CONTOGURIS**, and others, in violation of Title 15, United States Code, Section 78dd-2.

<u>Objects of the Conspiracy</u>

19.     A principal purpose and object of the conspiracy was for **CONTOGURIS** and the co-conspirators to enrich themselves by paying bribes to foreign officials in Kazakhstan in order to obtain and retain business for Rolls-Royce, RRESI, and others, in connection with AGP's gas pipeline between Kazakhstan and China.

<u>Manner and Means of the Conspiracy</u>

20.     The manner and means by which **CONTOGURIS**, together with his co-conspirators and others known and unknown to the Grand Jury, sought to accomplish the object of the conspiracy included, among other things, the following:

        a.  **CONTOGURIS**, RR-1, RR-2, RR-3, TA-1, TA-2, TA-3, and others, used telephone calls, Short Message Service ("SMS") and text messages, and electronic mail ("e-mail"), among other means, to discuss bribe payments to foreign officials,

6

including Foreign Official 1, in connection with Rolls-Royce and RRESI's efforts to win business with AGP.

b. **CONTOGURIS**, RR-1, RR-2, RR-3, TA-1, TA-2, TA-3, and others, traveled to and from the United States and several other countries to meet in person and arrange for bribe payments to be made to foreign officials, including Foreign Official 1, in order to assist Rolls-Royce and RRESI in winning business with AGP.

c. **CONTOGURIS**, RR-1, RR-2, RR-3, TA-1, TA-2, TA-3, and others, arranged meetings with Foreign Official 1 and Foreign Official 2 in order to solidify their influence in support of Rolls-Royce and RRESI's attempts to obtain and retain business from AGP.

d. **CONTOGURIS**, RR-1, RR-2, RR-3, TA-1, TA-2, TA-3, and others, caused Rolls-Royce and RRESI to enter into an advisor agreement with Gravitas, through which Rolls-Royce and RRESI paid commissions to Gravitas, which included bribes bound for foreign officials, including Foreign Official 1.

e. **CONTOGURIS**, RR-1, RR-2, RR-3, TA-1, TA-2, TA-3, and others, took various surreptitious steps to promote and conceal the bribery scheme, including by (i) using code names, such as "Fox" and "Fuchs," to refer to Foreign Official 1, and (ii) concealing the bribe payments to Foreign Official 1 within RRESI's commission payments to Gravitas.

f. **CONTOGURIS**, RR-1, RR-2, RR-3, TA-1, TA-2, TA-3, and others, transferred and caused to be transferred funds, including bribe payments, to and from bank accounts in the United States, Kazakhstan, the United Kingdom, the Bahamas, Singapore, Hong Kong, Switzerland, and elsewhere, to promote and conceal the bribery scheme.

7

    g.  **CONTOGURIS**, RR-1, RR-2, RR-3, TA-1, TA-2, TA-3, and others, discussed and disseminated confidential and internal AGP and Technical Advisor documents and information to help Rolls-Royce and RRESI win business with AGP.

    h.  **CONTOGURIS**, RR-1, RR-2, RR-3, TA-1, TA-2, TA-3, and others, used invoices in an attempt to provide the appearance of legitimacy to the commission payments and fund transfers.

## Overt Acts

21.    In furtherance of the conspiracy and to achieve the objects thereof, at least one of the co-conspirators committed, or caused to be committed, in the Southern District of Ohio and elsewhere, at least one of the following overt acts, among others:

22.    On or about September 25, 2008, **CONTOGURIS**, Foreign Representative, and RR-1 met in Moscow, Russia to discuss the ways in which **CONTOGURIS** and Foreign Representative could assist Rolls-Royce in winning business from AGP.

23.    On or about September 27, 2008, RRESI submitted a bid to AGP for Compressor Station 4.

24.    On or about October 30, 2008, **CONTOGURIS** and RR-3 flew to Kazakhstan, where they met with Foreign Official 1 and Foreign Representative.

25.    On or about November 27, 2008, RR-3 met with Foreign Official 2 and TA-3 in China and discussed potential business opportunities for Rolls-Royce with AGP, including supplying the gas turbine compressor packages for Compressor Station 4.

26.    On or about December 3, 2008, **CONTOGURIS** flew to London, England, where he met with RR-3, TA-2, Foreign Representative and Foreign Official 1.

27.    On or about December 4, 2008, **CONTOGURIS** e-mailed RR-3, copying TA-2, and recounting the December 3, 2008 meeting, stating:

[TA-2] and I sincerely hope that all of your concerns were laid to rest during the meeting with Mr. Fox. He has clearly taken a position and confirmed that [Foreign Representative] is designated as a welcome and reliable local partner. . . . You also saw how respectful [Foreign Representative] behaved vis-à-vis Mr. Fox. Everything is marching in the right direction.

Mr. Fox authorized [TA-2] to let you benefit from receiving information when and if it is being produced in order to give you more time to prepare. This is also an indication that he wanted you to know that he is the 'Master of the game'.

28.     On or about December 12, 2008, **CONTOGURIS** e-mailed RR-1 and RR-3 a copy of an internal AGP evaluation of the Competitor's bid for Compressor Station 4. **CONTOGURIS** wrote: "Job has not been awarded. Best tactic to follow is to let me know what we offer in terms of short and medium/long term remuneration scheme. Will process this through [Foreign Representative] and hope to turn it around. [TA-3] says Chinese have no objection. Please do not make available to anyone else but addresses."

29.     On or about December 27, 2008, RR-3 e-mailed **CONTOGURIS** a proposed engagement letter between Rolls-Royce and Gravitas for the AGP project that provided for Gravitas to be paid a 2% commission on new equipment for the compressor stations on the pipeline and a 6% commission for aftermarket sales.

30.     On or about December 27, 2008, **CONTOGURIS** replied to RR-3's e-mail: "[TA-1] told me yesterday that [Foreign Representative] would like to meet in Zurich . . . and take it to the next level."

31.     On or about December 27, 2008, **CONTOGURIS** forwarded to TA-1 and TA-2 the Rolls-Royce engagement letter from RR-3 and added a recap of where things stood, writing: "We met with Mr. Fox and [Foreign Representative] on June 28th . . . and agreed on the basic principle of cooperation. On the 29th of August we had the unsuccessful meeting with [the Competitor] and commenced the canvassing of RR." In the e-mail, **CONTOGURIS** also listed the meetings with RR-1, RR-2, and RR-3 over the previous few months, as well as "dozens of e-

mail exchanges and telephone calls," before noting:  "We are four partners, TA-3, TA-1, TA-2 and the undersigned."

32.    On or about January 11, 2009, **CONTOGURIS** e-mailed TA-1 and TA-2, and addressing TA-1, wrote:

> It may be stated without any doubt that without the joint efforts of [TA-2], [TA-1] and the undersigned (augmented by the valiant efforts of our friend and partner in Peking, [TA-3]) the Kazakh Group led by [Foreign Representative] would not have been able to proceed to the status quo we have managed to be elevated to. . . . The 'secret' weapon without much doubt, is the responsible role that the [Technical Advisor] is requested to assist [AGP] with the adjudication process. . . . I will do my best to bring [RR-1] and [RR-2] to the state-of-mind that will predicate our presence. . . . [Y]our contribution is to keep Fox in-line with the decision making process, however [TA-2] needs to head our efforts to negotiate a workable and therefore profitable deal for us.

33.    On or about January 15, 2009, RR-1, RR-2, TA-2 and **CONTOGURIS** met with Foreign Representative and his Swiss lawyers in Zurich, Switzerland.  At the meeting, Foreign Representative explained that Rolls-Royce's proposed bribe of 2% of the price for new equipment sales that Rolls-Royce received was not acceptable.  Foreign Representative instead demanded a bribe of 10% of the new equipment sales and threatened that Rolls-Royce would not win any business if it did not agree.

34.    On or about January 19, 2009, TA-1 e-mailed TA-2 to update him on the Zurich meeting and wrote:  "The main purpose was to find a deal for the future RR activity in Kz and upcoming tender for CS 4. . . .  RR informed they have no objection to a deal, but they need a clear source and company to deal via."

35.    On or about January 20, 2009, RR-1 e-mailed RR-2 and RR-3 to report that he had a phone call with TA-2 and **CONTOGURIS**, and "[TA-1] is to meet mr fox either tomorrow or friday. He needs input on how far rr is willing to go.  As discussed with [RR-2] last week this need[s] to come from reallicating [sic] the percentages.  After that [RR-3] [w]ill need to meet mr fox to confirm this number on very short notice."

36.     On or about January 26, 2009, **CONTOGURIS** sent an e-mail to RR-1, RR-2, and RR-3, and wrote that in his "persistent effort to render every kind of conceivable effort and endeavor to assist RR energy to be awarded the CS 4 and/or other contracts," he was attaching internal AGP documents, which he summarized as demonstrating the Chinese side of AGP's preferences for certain turbine specifications that could favor the Competitor.

37.     On or about January 26, 2009, RR-1 replied to **CONTOGURIS**'s e-mail: "As discussed earlier today we need all the support to turn Kazakhstan into our favor. Please ask you[r] friend [TA-3] to work from his angle. . . . I look forward to discuss [*sic*] our proposal . . . on the alternative solution to CS4."

38.     On or about January 26, 2009, TA-2 e-mailed TA-3: "Dear [TA-3], please do your utmost that [the Chinese partner at AGP] will consider RR's proposal and start negotiations with them soonest. Copy of the RR bid will be submitted to you immediately."

39.     On or about February 6, 2009, **CONTOGURIS** met with RR-1 and RR-2 in London, where they informed **CONTOGURIS** that based on the prior meeting in Zurich they would not move forward with **CONTOGURIS** as an advisor on the AGP bids if Foreign Representative continued to be involved.

40.     On or about February 24, 2009, **CONTOGURIS** and TA-2 had a conference call with RR-1 and RR-2, in which they agreed that Rolls-Royce would continue to work with **CONTOGURIS** on RRESI's AGP bids without Foreign Representative.

41.     On or about February 28, 2009, **CONTOGURIS** e-mailed TA-1 and TA-2, writing that "the offensive behavior of [Foreign Representative] has led RR to not want to collaborate with him." **CONTOGURIS** then proposed a way forward:

> I have suggested you [TA-1] be the official RR man on the ground in Kazakahstan [*sic*], in whatever function. . . . GM or Chief Advisor Kazakhstan or whatever. . . . You secure the

11

collaboration of your friend [Foreign Official 1]. I am going to install [*sic*] an absolutely satisfactory system how future revenues are going to be distributed.

**CONTOGURIS**, switching to the third person, then wrote: "We shall distribute 60% to your friend and 10% each to our partner in China [TA-3], our partner in Kazakhstan [TA-1], our partner in Austria [TA-2] and our partner in Turkey [**CONTOGURIS**]." **CONTOGURIS** also proposed paying Foreign Official 1 his split of the Gravitas commission from Rolls-Royce through TA-1 via a Singaporean shell company.

42. On or about March 5, 2009, TA-1 responded to **CONTOGURIS**: "I [met] Mr. Fox and we also discussed RR issue. He agreed and has nothing against that I will be in charge for dealing with RR. The scheme as in your e-mail might be implemented."

43. On or about March 20, 2009, AGP awarded the contract for Compressor Station 4 to the Competitor.

44. On or about May, 8, 2009, RRESI submitted its bid to supply AGP with 14 gas turbine compressor packages for Compressor Stations 1, 2, 6, and 7.

45. On or about May 8, 2009, after RR-1, RR-2, RR-3, and others at RRESI realized that its margins were going to be much lower than it had first anticipated, RR-3 e-mailed **CONTOGURIS** a new commission agreement which provided for a Gravitas commission reduced from 2% to 1.5% on new equipment for the compressor stations on the pipeline and reduced from 6% to 3% for aftermarket sales.

46. On or about May 9, 2009, **CONTOGURIS** forwarded RR-3's e-mail to TA-1 and wrote: "RR have told me that this is the absolute maximum they can afford in their calculation, whilst still remaining competitive. [TA-1] please be so kind and speak to your people and obtain their concurrence that this agreement should be countersigned and entered into."

12

47.     On or about May 12, 2009, TA-1 replied to the e-mail from **CONTOGURIS** referenced in Paragraph 46 above, stating:   "I should have a private meeting with Mr. Fox in several days. . . . Meanwhile could you please advise – if I indicate 1,5% and then 3% and it [g]oes all to Fox&company where is our interest to be ingaged [*sic*] in the process?"

48.     On or about May 12, 2009, **CONTOGURIS** responded to the e-mail from TA-1 referenced in Paragraph 47 above, stating:   "Bottom line is that I do not know how to answer your question.   We have what we have and Fox has to at least share 2/3 1/3, we definitely do not want the business otherwise. . . .[I]f Fox is not agreeable to support the RR fully as and [*sic*] what we have on the table today, I will cancel the arrangement and tell them to go ahead without our support."

49.     On or about June 6, 2009, TA-1 e-mailed **CONTOGURIS** after TA-1 met with "Fox," and wrote:

> Summary: R is very competitive from all points of view (technical and price).   To negotiate the relations with R, at this point he indicated that 1,5 and 3 is not acceptable and proposed 3,5 and 3,5.   But I clearly understood it is negotiable (I mean it should be a room for us, otherwise bringing the Client and working with him for a year for free it's a nonsense). . . . I believe at least 0,5 should be reserved for us. . . .

50.     On or about June 12, 2009, **CONTOGURIS** sent an e-mail to TA-1 with the subject line "our friends in London," explaining that **CONTOGURIS** tried to push Rolls-Royce to increase the Gravitas commission but it would not go further and was "prepared to walk away from the transaction completely."   **CONTOGURIS** noted:   "The corporate governance processes of this listed company is formidable, there are forty employees in a division that is specifically designed to avoid exactly this what your friend wants to do now."

51.     On or about June 18, 2009, TA-1 responded to the e-mail from **CONTOGURIS** referenced in Paragraph 50 above, stating that "Mr. Fox [wa]s getting angry," that the "proposed

3,5 [wa]s already the lowest ever on the market," and that "[t]he arguments – 'listed company' or 'corporate governance process' they can leave for mass media" because other "even bigger caliber" companies were always able to find a "compromise."

52.     On or about June 21, 2009, **CONTOGURIS** e-mailed TA-1 and TA-2 and stated: "Tell Mr. Fuchs to proceed as is and we will cede 75% of the current agreement to your Singapore company.   That means that you will receive 1.833.750,-USD at this stage and we will be satisfied with 611.000,-USD. . . . As it is there are 6.7 Million lying on the table for Fuchs and 1.8 Million for us from phases 1 +2." **CONTOGURIS** added: "This is a listed company operating in a country where anti-corruption laws are the strictest in Europe.   If it had not been for my 8 Billion USD track record and my business acumen shown, at least [TA-2] knows that, there would not be a deal on the table."

53.     On or about August 3, 2009, RR-2 and RR-3 traveled to Astana, Kazakhstan and met with TA-1, where they discussed RRESI's bid and prepared for AGP's upcoming bid clarification meetings.

54.     On or about August 4, 2009, **CONTOGURIS** sent an e-mail to RR-3, copying TA-2, in which **CONTOGURIS** advised that he had learned that RRESI's bid had a potential technical deficiency in the proposed emissions efficiency and that one way to address it involved going "through [TA-3]'s Chinese support structure" where TA-3 had "unimaginable ways" of "reaching" into the Chinese government.

55.     On or about August 10, 2009, TA-1 e-mailed RR-3:   "I have discussed with Fox the issue.   Diplomatically he answered support will be provided, but now also a lot depends on your technical clarification."

56.     On or about August 13, 2009, RR-2 and RR-3 visited **CONTOGURIS** at his home in Istanbul, Turkey and confirmed that they would increase the commission percentage RRESI

would pay to Gravitas for new equipment by .75% (for a total of 2.25%) if RRESI won all 14 turbines that were up for bid (for Compressor Stations 1, 2, 6 and 7), and .25% (for a total of 1.75%) if it won fewer than all 14.

57.     On or about August 14, 2009, TA-3 e-mailed **CONTOGURIS** and relayed that he had learned that "Chinese preferable option is: CS No-1 for [the Competitor] (from supply schedule reason and 'if Kazakh side can keep a face'). Other 3 station for RR. . . ."

58.     On or about August 14, 2009, **CONTOGURIS** e-mailed TA-1 and TA-2, summarizing the split between Foreign Official 1 and TA-1, TA-2, TA-3, and **CONTOGURIS**: "That means the final picture is the following: In case all 14 machines are awarded the Foxtrott Co will receive 1.50%, the balance will go to the 'Quatrumphirate'. In case less than 14 machines, the 1.25% will go to Foxtrott Co and the balance will go to 'Quatrumphirate.'."

59.     On or about August 15, 2009, TA-1 replied to the e-mail from **CONTOGURIS** referenced in Paragraph 58 above, stating: "I made my best recently to sort out at least our position towards [RR-3] and lialize [*sic*] with Fox." TA-1 explained that "[w]hat [wa]s more difficult was to influence [*sic*] [Technical Advisor's] engineers!"

60.     On or about August 28, 2009, after individuals within the Kazakh side of AGP circulated an internal memorandum deeming RRESI's bid "technically unacceptable" and recommending disqualification, TA-2 attached the memorandum to an e-mail to TA-3, and copied **CONTOGURIS**. TA-2 noted that, "the Kazakhs have used the weak points of RR and calculated very high financial losses," and asked TA-3, "How is the situation now?"

61.     On or about August 28, 2009, **CONTOGURIS** forwarded to RR-3 the e-mail referenced in Paragraph 60 above and wrote that TA-3 was "reporting from Peking" that a Chinese foreign official told him that nothing was decided yet and that they were "trying [their] best to increase the leverage from Chinese side, to stop the bloody Kazak [*sic*]."

62.     On or about August 30, 2009, TA-1 met with Foreign Official 1 to discuss AGP's internal recommendation to disqualify RRESI.

63.     On or about September 6, 2009, RR-3 sent an SMS or "text message" to TA-1 saying "the deal with fox is cancelled."

64.     On or about September 7, 2009, TA-1 e-mailed RR-3, copied RR-2 and **CONTOGURIS**, and explained that Foreign Official 1 had "initiated an internal investigation" into the memorandum disqualifying RRESI while Technical Advisor had refused to endorse it. TA-1 explained that "[b]ecause of Fox and our company position (plus to certain extend [*sic*] Chinese position) [the disqualification] decision is blocked."   Referring to RR-3's SMS, TA-1 then wrote "I'm stick [*sic*] to . . . agreements reached, unless they are cancelled.   I feel regret now to be involved in all this discussions (which, as gentlemen, we should keep absolutely in high confidentiality).   Also my reputation (in front of Fox, for example) can be harmed. . . .   I kindly ask you asap to confirm/or not your sms."

65.     On or about September 11, 2009, **CONTOGURIS** e-mailed RR-2 and RR-3, attaching a confidential written report from Technical Advisor setting out arguments for why the internal memorandum disqualifying RRESI was incorrect and proclaiming that RRESI's bid was acceptable.   In the e-mail, **CONTOGURIS** wrote:   "I sincerely hope that your previously mentioned grievances have been put to rest. . . . I am sure you can 'use' this adequately.   If you cannot provide access of this document to your Chinese friends, please let me know and I will inform [TA-3] to hand it over officially."

66.     On or about November 22, 2009, AGP awarded RRESI a contract to supply 11 of the 14 gas turbine compressor packages for approximately $145 million.

67.     Approximately three days later, on or about November 25, 2009, Gravitas and RRESI executed a written advisor agreement.

68. On or about the following dates, **CONTOGURIS**, RR-1, RR-2, RR-3, TA-1, TA-2, TA-3, and others, caused AGP to make the following corrupt payments from AGP's bank accounts in Kazakhstan to bank accounts belonging to RRESI in Mount Vernon, Ohio, located in the Southern District of Ohio, with the knowledge and intent to use part of the corrupt payments to bribe Foreign Official 1 in furtherance of the corrupt bribery scheme:

| Overt Act | Date | Amount |
|---|---|---|
| 68.a. | January 14, 2010 | $43,589,766.00 |
| 68.b. | July 7, 2010 | $10,563,820.08 |
| 68.c. | October 4, 2010 | $10,563,820.08 |
| 68.d. | October 28, 2010 | $10,563,820.08 |
| 68.e. | December 3, 2010 | $7,920,234.52 |
| 68.f. | January 5, 2011 | $10,563,820.08 |
| 68.g. | June 10, 2011 | $7,920,234.52 |
| 68.h. | December 30, 2011 | $14,088,937.34 |
| 68.j. | June 24, 2013 | $18,484,054.60 |
| 68.k. | July 5, 2013 | $10,563,820.08 |

69. On or about the following dates, **CONTOGURIS**, RR-1, RR-2, RR-3, TA-1, TA-2, TA-3, and others, caused RRESI to make the following corrupt commission payments from RRESI's bank accounts in Mount Vernon, Ohio, located in the Southern District of Ohio, to Gravitas's bank accounts in the United Kingdom, with the knowledge and intent to use part of the commission payments to bribe Foreign Official 1 in furtherance of the corrupt bribery scheme:

17

| Overt Act | Date | Amount |
|---|---|---|
| 69.a. | April 27, 2010 | $732,877.21 |
| 69.b. | October 1, 2010 | $177,683.30 |
| 69.c. | December 14, 2010 | $355,366.59 |
| 69.d. | February 24, 2011 | $133,218.23 |
| 69.e. | April 19, 2011 | $177,683.30 |
| 69.f. | September 21, 2011 | $133,218.23 |
| 69.g. | March 8, 2012 | $236,975.71 |

70.     In or around February 2010, **CONTOGURIS** lobbied RR-3 for the full 2.25% commission even though RRESI won fewer than the 14 total units up for bid.

71.     On or about February 27, 2010, after RR-3 refused to pay more than the agreed upon 1.75%, **CONTOGURIS** sent RR-3 an SMS:   "Very sad that after positioning RR with a lot of patience and continuous follow-up from my side, that you have not seen it necessary to personally attend to outstanding matters, which is necessary."

72.     On or about February 27, 2010, **CONTOGURIS** forwarded the SMS referenced in Paragraph 71 above as an e-mail to TA-2 and wrote:   "Tell Fuchs no dice from RR."

73.     In or around August 2010, TA-1 told **CONTOGURIS** and TA-2 that Foreign Official 1 would agree to accept a lump sum of $500,000 USD from **CONTOGURIS** as the payment for the RRESI award rather than wait until **CONTOGURIS** received all of the commission payments from RRESI.

74.     On or about September 19, 2010, TA-1 sent an e-mail to **CONTOGURIS** and TA-2, in which he attached a document with details for his Singaporean shell corporation and wrote: "Kindly asking you to proceed."

75. On or about February 14, 2011, **CONTOGURIS** made the first of approximately six transfers of the commissions RRESI paid to Gravitas from the U.K. bank account to accounts in the Bahamas and Switzerland.

76. On or about February 14, 2011, TA-1's accountant sent TA-1 five invoices from TA-3 to TA-1's Singaporean shell corporation. The invoices falsely stated that they were for partial payments for purported work done on a "business development project in China carried out in 2008," and were dated from 2008 and 2009.

77. On or about February 17, 2011, TA-1's Singaporean shell corporation wired approximately $99,230 to TA-3's bank account in Hong Kong.

78. On or about March 15, 2011, **CONTOGURIS** wired $500,000 from a bank account in the Bahamas to TA-1's bank account in Switzerland.

79. On or about March 15, 2011, **CONTOGURIS** sent an e-mail to TA-1 with a subject of "Final payment of personal debts," and wrote: "I finally managed to make the transfer yesterday and have finally been able to settle all the loans extended to me . . . as agreed, total sum 500K."

80. On or about March 9, 2012, approximately one day after RRESI paid its last commission payment installment to Gravitas, **CONTOGURIS** transferred approximately $232,223 of the $236,975 to his bank account in Switzerland.

81. On or about April 11, 2012, TA-3 e-mailed **CONTOGURIS** two invoices, both dated March 30, 2012, each in the amount of $25,000. The invoices requested payment for "[TA-3]'s fees for services rendered for successfully negotiating and signing for and on behalf of Gravitas" on a project in China.

82. On or about April 17, 2012, **CONTOGURIS** wired approximately $50,000 from a bank account in the Bahamas to TA-3's bank account in Hong Kong.

19

All in violation of Title 18, United States Code, Section 371.

### COUNTS TWO THROUGH EIGHT
**(15 U.S.C. § 78dd-2 and 18 U.S.C. § 2 – Foreign Corrupt Practices Act)**

83.     Paragraphs 1 through 16 and 19 through 82 are re-alleged and incorporated by reference as though fully set forth herein.

84.     On or about the dates set forth below, in the Southern District of Ohio and elsewhere, the defendant,

**PETROS CONTOGURIS,**
**a/k/a PETROS CONTOGURIS-TROEMEL,**

being an agent of a domestic concern, did willfully make use of and cause to be used the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value, to a foreign official and to any person, while knowing that all, or a portion of such money and things of value would be and had been offered, given, and promised to a foreign official, for purposes of (i) influencing acts and decisions of such foreign official in his or her official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing any improper advantage; and (iv) inducing such foreign official to use his or her influence with a foreign government and agencies and instrumentalities thereof, to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist RRESI and others known and unknown, in obtaining and retaining business for and with, and directing business to, **CONTOGURIS**, Rolls-Royce, RRESI, and others, to wit:   causing the following wire transfers to be made from RRESI's bank accounts in Mount Vernon, Ohio, located in the Southern District

of Ohio, to Gravitas's bank accounts in the United Kingdom, and aiding and abetting such wire

transfers:

| COUNT | DATE | AMOUNT |
|-------|------|--------|
| 2 | April 27, 2010 | $732,877.21 |
| 3 | October 1, 2010 | $177,683.30 |
| 4 | December 14, 2010 | $355,366.59 |
| 5 | February 24, 2011 | $133,218.23 |
| 6 | April 19, 2011 | $177,683.30 |
| 7 | September 21, 2011 | $133,218.23 |
| 8 | March 8, 2012 | $236,975.71 |

All in violation of Title 15, United States Code, Section 78dd-2 and Title 18, United States

Code, Section 2.

## COUNT NINE
### (18 U.S.C. § 1956(h) – Money Laundering Conspiracy)

85.     Paragraphs 1 through 16 and 19 through 82 are re-alleged and incorporated by

reference as though fully set forth herein.

86.     On or about the dates set forth below, in the Southern District of Ohio and

elsewhere, the defendant,

### PETROS CONTOGURIS,
### a/k/a PETROS CONTOGURIS-TROEMEL,

together with TA-1, TA-2, TA-3, and others known and unknown to the Grand Jury, willfully and

knowingly did combine, conspire, confederate, and agree together with each other to commit

offenses under Title 18, United States Code, Section 1956, namely, to transport, transmit, and

transfer a monetary instrument and funds from a place in the United States to and through a place outside the United States, and to a place in the United States from and through a place outside the United States, (A) with the intent to promote the carrying on of specified unlawful activity, namely, bribery of a foreign official, a felony violation of the FCPA, Title 15, United States Code, Section 78dd-2, and (B) knowing that the monetary instrument and funds involved in the transportation, transmission, and transfer represented proceeds of some form of unlawful activity, namely, bribery of a foreign official, a felony violation of the FCPA, Title 15, United States Code, Section 78dd-2, and knowing that such transportation, transmission, and transfer was designed in whole or in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(2)(A), (B).

All in violation of Title 18 United States Code, Section 1956(h).

## COUNTS TEN THROUGH NINETEEN
### (18 U.S.C. §§ 1956(a)(2)(A), (B), & 2 – Money Laundering)

87. Paragraphs 1 through 16 and 19 through 82 are re-alleged and incorporated by reference as though fully set forth herein.

88. On or about the dates set forth below, in the Southern District of Ohio and elsewhere, the defendant,

**PETROS CONTOGURIS,**
**a/k/a PETROS CONTOGURIS-TROEMEL,**

transported, transmitted, and transferred, and attempted to transport, transmit, and transfer, a monetary instrument and funds from a place in the United States to and through a place outside the United States, and to a place in the United States from and through a place outside the United States, (A) with the intent to promote the carrying on of specified unlawful activity, namely,

22

bribery of a foreign official, a felony violation of the FCPA, Title 15, United States Code, Section 78dd-2, and (B) knowing that the monetary instrument and funds involved in the transportation, transmission, and transfer represented proceeds of some form of unlawful activity, namely, bribery of a foreign official, a felony violation of the FCPA, Title 15, United States Code, Section 78dd-2, and knowing that such transportation, transmission, and transfer was designed in whole or in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of specified unlawful activity, to wit: causing the following wire transfers from AGP's bank accounts in Kazakhstan to RRESI's bank accounts in in Mount Vernon, Ohio, located in the Southern District of Ohio, and aiding and abetting such wire transfers:

| COUNT | DATE OF OFFENSE | AMOUNT |
|---|---|---|
| 10 | January 14, 2010 | $43,589,766.00 |
| 11 | July 7, 2010 | $10,563,820.08 |
| 12 | October 4, 2010 | $10,563,820.08 |
| 13 | October 28, 2010 | $10,563,820.08 |
| 14 | December 3, 2010 | $7,920,234.52 |
| 15 | January 5, 2011 | $10,563,820.08 |
| 16 | June 10, 2011 | $7,920,234.52 |
| 17 | December 30, 2011 | $14,088,937.34 |
| 18 | June 24, 2013 | $18,484,054.60 |
| 19 | July 5, 2013 | $10,563,820.08 |

All in violation of Title 18, United States Code, Sections 1956(a)(2)(A), (B), and 2.

## CRIMINAL FORFEITURE ALLEGATION
### (18 U.S.C. § 981(a)(1)(C) & 28 U.S.C. § 2461(c))

89.     Paragraphs 1 through 88 of this Indictment are hereby re-alleged and incorporated by reference for the purpose of alleging forfeitures to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

90.     Upon conviction of one or more violations of Title 15, United States Code, Section 78dd-2 and/or Title 18, United States Code, Section 371, as alleged in this Indictment, the defendant, **PETROS CONTOGURIS, a/k/a PETROS CONTOGURIS-TROEMEL,** shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, constituting or derived from proceeds traceable to such offense(s).

### Substitute Assets

91.     If any of the forfeitable property described above, as a result of any act or omission by the defendant, **PETROS CONTOGURIS, a/k/a PETROS CONTOGURIS-TROEMEL**:

    a.  cannot be located upon the exercise of due diligence;

    b.  has been transferred or sold to, or deposited with, a third party;

    c.  has been placed beyond the jurisdiction of the Court;

    d.  has been substantially diminished in value; or

    e.  has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States of America, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1) and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant, **PETROS**

**CONTOGURIS, a/k/a PETROS CONTOGURIS-TROEMEL**, up to the value of the above forfeitable property.

Forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C), Title 28, United States Code, Section 2461(c), and Rule 32.2 of the Federal Rules of Criminal Procedure.

**A TRUE BILL.**

_____
**FOREPERSON**

SANDRA MOSER
ACTING CHIEF, FRAUD SECTION

BENJAMIN C. GLASSMAN
UNITED STATES ATTORNEY

KEVIN R. GINGRAS
VANESSA SNYDER
Trial Attorneys, Criminal Division
U.S. Department of Justice

J. MICHAEL MAROUS
JESSICA H. KIM
Assistant United States Attorneys
Southern District of Ohio

25